### GRAY et al. v. QUICKSILVER MIN. CO.

(Circuit Court, N. D. California. June 24, 1895.)

1. ADMINISTRATOR'S SALE—PURCHASE BY ADMINISTRATOR'S EMPLOYER.

Defendant, a creditor of an intestate estate, and hence entitled to name an administrator thereof (Prob. Act Cal. § 52), procured the appointment of one of its employés as administrator, and indirectly became purchaser at the administrator's sale. *Held*, that such employé could properly act as administrator, and that, though defendant paid the expenses of administration, it did not become administrator within the California laws prohibiting an administrator from purchasing directly or indirectly the estate he represents.

2. SAME—EVIDENCE OF FRAUD.

An employé of defendant, at its request, was appointed administrator of an estate of which it was a creditor, consisting of an interest in mining property. Such interest was of uncertain value, and was disputed by

claimants under the same title as decedent, and by defendant claiming under an adverse title. It was appraised at $11,100, and sold for $27.755 to an officer of defendant, and, through a nominal purchaser, conveyed to defendant. Letters written by such officer pending administration showed the desire to avoid publicity, and hasten sale and confirmation thereof before his bid could be raised, and stated that the price paid by defendant was low. *Held* that, though the circumstances of the administration and sale challenged inquiry, they did not amount to fraud.

3. LIMITATION OF ACTIONS—ADMINISTRATOR'S SALE.
    The statute requiring a suit to recover land sold at an administrator's sale to be brought within three years does not apply when there is no person who can bring suit.

Bill by Jane M. Gray and others against the Quicksilver Mining Company for a decree declaring defendant to be a trustee for plaintiffs of certain mining property.

Pierson & Mitchell, for complainants.
Wm. Matthews and E. J. Pringle, for respondent.

McKENNA, Circuit Judge (orally).    This is an action to declare defendant trustee of the plaintiffs, or the estate of their intestate, of certain mines and minerals situate on the Rancho De Los Capitancillos (what is known as the "Almaden Mine").    Both plaintiffs and defendant claim from the Mexican government, through a grant by the latter to one Justo Larios, which grant was patented by the United States in the name of Charles Fossatt, by patent dated February 3, 1865.    The patent to the mines and minerals became separated from the title to the land, or was attempted to be separated, by Grove C. Cook, grantee of Justo Larios, calling himself "allodial owner" of the rancho, by conveying by deed dated April 1, 1848, to plaintiffs' intestate, John B. Gray, and one Knowles Taylor, in the proportions of two-fifths and three-fifths, respectively, "together [to quote deed] with the right of way, water, grazing for cattle;  *  *  *  also land sufficient for establishing smelting works, building houses, and all other purposes necessary for the secure and profitable carrying on of the aforementioned mines."

A trust was declared and created in this property by an instrument dated March 21, 1850, in which it was recited, after setting out certain conveyances, as follows:

"And whereas, other parties or persons than the beforenamed Knowles Taylor and John B. Gray have interest in said purchases, and it being desirable and proper to work said lands, mines, minerals, and ores, and prosecute the business connected therewith; and whereas, the title to said lands, mines, minerals, ores, rights, privileges, interests, and benefits, and their appurtenances, is now standing in the name of said Knowles Taylor and John B. Gray, in the following proportions, to wit, three-fifths part in the name of said Knowles Taylor, and two-fifths part in the name of the said John B. Gray; and it being desirable that each party in interest and ownership should have now this written declaration and conveyance of his interest, or portion in said lands, mines, minerals, ores, rights, privileges, interests, benefits, and the appurtenances of every kind pertaining thereto: Now, know all men by these presents, that we, the said Knowles Taylor and Eliza L., his wife, and the said John Bowie Gray and Jane M., his wife, for and in consideration of the premises and of the sum of one dollar to each of us paid by the parties thereto of the second part, at and before the ensealing and delivery of these presents, the receipt whereof we and each of us hereby acknowledge, and in further con-

sideration of the payment heretofore made by each of the said parties of the second part of their respective relative proportion of the purchase money of said property, mines, minerals, ores, et cetera, and of all expenses incident thereto, have granted, bargained, sold, conveyed, and transferred, and by these presents do grant, bargain, sell, assign, convey, and transfer, unto the said Robert J. Walker, Knowles Taylor, and John Bowie Gray, trustees, as hereinafter mentioned, all and singular the aforedescribed lands, mines, minerals, ores, rights, privileges, interests, benefits, and the appurtenances of every kind which pertain thereto, and by the recited indentures or conveyances aforesaid were conveyed and transferred to the said Knowles Taylor and John B. Gray, together with all the estate, right of dower, title, interest, property, claim, and demand whatsoever of the said Knowles Taylor and Eliza L., his wife, and the said John Bowie Gray and Jane M., his wife, as well at law as in equity, of, in, and to, and out of the same, and every part thereof, from and after the date hereof, and by this indenture, and for the purposes and uses as hereinafter set forth and declared, to be held and possessed by the said Robert J. Walker, Knowles Taylor, and John B. Gray, as associate trustees, their heirs and the survivor of them, his heirs and assigns, forever, as joint tenants, and not as tenants in common, upon the special trust and confidence, however, and for no other purpose than is herein set forth and declared. * * * It is further agreed that with a view to ascertain results and settle controversies, if any should arise, no one of the parties interested will, within any period of two years from this date, sell any portion of his interest in said property, mines, minerals, et cetera, to any person not a party to this agreement. The estate, rights, privileges, benefits, and property of the said parties as hereinbefore set forth and granted, or hereafter shall be obtained, shall be and remain vested in the said trustees and their successors, their heirs and assigns, in joint tenancy as aforesaid, but subject to the control and direction of the parties by a vote of not less than two-thirds of the whole number of shares in the affirmative, with the rights of the said two-thirds of the whole number of shares, by the vote in the affirmative of filling any vacancy or vacancies that may occur in the board of said trustees by resignation, death, or otherwise, and to alter these trusts. The objects, designs, and business of the said parties shall be the proper management and administration of the said estate, property, mines, minerals, ores, rights, privileges, benefits, and all other matters and things relating and appertaining thereto, so as to make the said lands and mines active and productive, that the parties may receive the best possible benefit and profit annually therefrom. The whole affair and business of the said parties herein shall be directed and governed, prosecuted and managed, by the said trustees, or by a majority of them, their successors, their heirs and assigns. And the said trustees, or a majority of them, are hereby authorized and empowered to appoint such agent or agents in the management of the business, and to fix the compensation of such agent or agents, as they shall think proper."

In January, 1853, Taylor died, leaving Walker and Gray surviving; and on June 2, 1861, Gray died in New York, intestate, leaving plaintiffs as his only heirs at law. Walker is also dead. Prior to his death, he conveyed his individual interest under the trust deed,—that is, his interest separate from that as trustee,—and the defendant became the owner of it. The defendant also claims to be the successor to the title and interest of Forbes, Baron & Co., the old Almaden Company, and the evidence seems to establish that the latter occupied and exclusively worked the mines for years, in hostility to the Laurencel & Eldridge title, under which plaintiffs claim. On the 10th of October, 1863, Christopher E. Hawley presented a petition to the probate court of the county of Santa Clara, setting forth the death of John Bowie Gray; the fact that the names, ages, and residences of the heirs were unknown to him; that the deceased died intestate, owning in fee at the time of his

death 111²/₁₀₀ equal undivided four-hundredth parts of, in, and to all the "mines, minerals, and ores, of whatever character or description, that were found on the 1st day of April, A. D. 1848, or that have since been found, or that hereafter may be found, in the tract of land in said state and county in the rancho called 'De Los Capitancillos,' formerly granted to Justo Larios, together with certain rights, privileges, and appurtenances as the same were granted by Grove C. Cook and wife to Knowles Taylor and said deceased John Bowie Gray, by conveyance dated the 1st day of April, 1848; the said property described in said conveyance with certain other property having been by a certain indenture conveyed to Knowles Taylor, John Bowie Gray, and R. J. Walker in trust," etc. He was appointed November 10, 1863, and qualified February 25, 1864, by giving a bond of $16,200, and letters of administration issued to him on the 25th. Notice to creditors was ordered, and appraisers were appointed, and estate duly appraised at $11,100, on May 2, 1864. Claims aggregating $106,529.24 were presented and duly allowed; and, after due proceedings were had, the interest of said Gray in said mines and minerals was sold to Henry O. Lyons for $27,755, which sale was confirmed by the probate court, and deed executed. Lyons deeded to Butterworth, and the latter to defendant. Hawley was the engineer of the defendant company, and Butterworth was its superintendent.

The claims presented against the estate were as follows: Sidney L. Johnson, $48,617.93; Quicksilver Mining Company, $49,579.31; George Flemming, $916.87; Andrew Glassell, $7,416. Sidney L. Johnson's claim was composed of the principal and interest of four notes of $5,000 each, given by one Middleton to Gray, and by the latter to Robert J. Walker, and a note of $10,000 given by Gray to Middleton, and indorsed by the latter to Walker. The $5,000 notes were secured by a mortgage, executed in favor of Walker, by Gray, Middleton, and Walker. There was also attached to the claim, as a voucher, a complaint in a suit brought by Robert J. Walker against Henry H. Taylor, John W. Middleton, et al. This complaint recited the conveyance from Grove C. Cook to Gray and Taylor. The declaration of trust in the property, quoting the substance of the trust deed, states the papers upon which the purchase was made, and the difficulties and controversies over the title and lawsuits conducted by Walker, "at the wish [to quote the complaint] of Gray," for which he was to be liberally compensated, and also states the necessity and fact of employing other counsel, the incurring of indebtedness, and disbursing large sums of money. The legal controversies over and in defense of the property are enumerated in the complaint. The amount claimed by complainant for services and expenses is $189,490.37, and it is prayed to be recovered against defendants, according to their respective interests, and be a lien on the property. An itemized account is attached to the complaint. A claim was also presented by Samuel F. Butterworth, as president of the Quicksilver Mining Company, the defendant. In this claim the Quicksilver Mining Company claimed as assignee of Robert J. Walker, and refers to the complaint in Walker

v. Taylor et al., supra. The amount claimed as Gray's proportion of the indebtedness is $49,579.31. Glassell's claim was for principal and interest on a note and mortgage executed by Gray.

The plaintiffs introduced the following letters:

A letter from S. F. Butterworth to C. A. Bradley, dated September, 1864:

"On my arrival I found that nothing had been done by the administrator of estates of Gray and Taylor. I immediately had our claim acquired from Walker allowed by the administrator and by the probate judge. I also purchased from Glassell, formerly attorney of Gray, and a troublesome fellow, his claim against Gray's estate, amounting to some $8,000. for $1,000, and thereby secured his aid. After the allowance of these claims, I had an order published to show cause why the estate should not be sold to pay debts. The time to show cause expires this month, and then I will have the order of sale, and, after the usual advertisement, the sale. I have no doubt but that I shall be able to purchase at the sale all of the rights and interests of Gray and Taylor in minerals of Fossatt for less than our claim."

A letter from Mr. S. F. Butterworth to William Bond, dated November 2, 1864:

"Please inform Mr. Bradley that on the 29th of October I purchased all of the interests of the estates of Gray and Taylor in the minerals of the Fossatt Ranch. The claims of the company against the Gray estate amount to $60,000, approved by the administrator and surrogate. I bid $38,000. * * * I hope to have these sales confirmed by the probate judge this month, and then I shall be relieved from a great anxiety. If, before the probate court holds its next term, this month, any one comes in and offers ten per cent. more than my bid, the offer may be taken by the judge, or there may be a new sale. For this reason I used the name of Judge Lyons in making the purchase; and, if any one bids the ten per cent., I can come in and bid over him. I hope to escape all this, as I have conducted the proceedings all very quietly, and yet strictly in accordance with the requirements of the statute."

A letter from Mr. Butterworth to William Bond, dated December 12, 1864:

"Since my last, the administrator's sale of the interests of Gray and Taylor in the Fossatt Ranch and the minerals therein has been confirmed, and the deed executed to the company. I bid for Gray's interest the sum of $27,775, and, as we are the creditors, we pay in cash only the administrator's fees and other necessary expenses of sale. I purchased some time ago the mortgage of Glassell, amounting to $10,000, for $1,000. I did this to quiet him,— a busy attorney,—and to enable me to bid a large amount, if necessary. I think the company very fortunate in obtaining the interest so cheaply, and congratulate myself on the mode and manner of their acquisition."

A letter from S. F. Butterworth to R. F. Peckham, dated March 25, 1865:

"Received yours of the 24th inst. I do not think it necessary to wait for the names of the Gray and Taylor heirs. Let the proceedings be instituted and carried through as speedily as possible."

Hawley testifies that he became administrator at the instance of Butterworth. The memories of all witnesses were imperfect, and hence their testimony was vague and uncertain, but it may be inferred that the Quicksilver Mining Company had become the owner or interested in the claim presented by Sidney L. Johnson against the estate. Johnson, however, seems to have taken an interest in the proceedings, as Judge Rhodes testifies. The judge's recollection, however, like that of other witnesses, was dim to almost

extinction. At first, he did not remember the original employment, but said a gentleman came to his office in San José, who claimed to be S. F. Butterworth, and inquired about the progress of the administration, and, upon being questioned about his interest, said, "It is our matter," or, "These proceedings were for us." But, when the name of Sidney L. Johnson was mentioned to him (Judge Rhodes), he replied that he knew him well, and, stating that his memory was refreshed, testified: "I think my employment came through him, and the name of Janin is connected with it in some way as well." Janin claimed to be a creditor of Gray, and presented a claim against the estate, which was rejected. A further citation of the evidence is unnecessary to the points I shall consider.

It is contended by plaintiffs that this evidence shows that the defendant was the administrator of the estate of Gray, and its purchase from Lyons, who purchased at the administrator's sale, was an infringement of its duty, and particularly of the California laws, which prohibit an executor or an administrator, directly or indirectly, from purchasing any property of the estate he represented.

In Boyd v. Blankman, 29 Cal. 19, it was held that in such case the sale was not void, but the administrator could be held as trustee of the title. This, however, is but the general principle applicable to a trustee dealing with his trust, carefully expressed by the statute; and the claim of the plaintiffs under it is answered by the supreme court in Clark v. Trust Co., 100 U. S. 149. The facts of this case were as follows: One McGhan and wife conveyed the premises in controversy to one Edward Clark, in trust for Mrs. McGhan. Clark and the McGhans conveyed the property to one Daniel Eaton, to secure the payment of a debt of the McGhans to the Freedman's Savings & Trust Company for the sum of $10,000. Upon default of the provisions of the conveyance, it was provided that the property should be sold at public auction, to pay the obligation incurred. Default was made, and the property was sold. the company becoming the purchasers for $13,000. Eaton, the trustee in the conveyance, was the actuary of the Freedman's Savings & Trust Company; and the sale was assailed upon this, as well as upon unfairness in the proceedings and inadequacy of price. It will be observed the relations of the parties in this case are similar to the relations of the parties in the case at bar. Eaton was an officer of the Freedman's Savings & Trust Company. Hawley was an employé of the Quicksilver Mining Company. What Eaton did was for the company. What Hawley did, it is alleged, was for the Quicksilver Mining Company. The sale in both cases was made at public auction,—in the one case, to the company directly; in the other, to the Quicksilver Mining Company indirectly, Lyons being the purchaser, Butterworth receiving from him, and the company from Butterworth. The supreme court said:

"Touching this objection, it is sufficient to say that the deed was not made to Eaton in his capacity of an officer of the company, nor did he act in that capacity when exerting the authority conferred upon him. The fact that he held official relations to that company did not incapacitate him from accepting the trust set out in the deed of June 22, 1870, or discharging the duties thereby imposed. It is true that his relations to the company would make it the duty

of a court to scrutinize very closely all that he did in the execution of a trust, but we find nothing in the evidence to justify the belief that he acted otherwise than honestly and faithfully in the discharge of his duty. The evidence does not justify the charge that he bid off the property for the company."

If, therefore, an employé of a corporation may have a separate individuality (a proposition seemingly plain), it follows, necessarily, that he may be an administrator of an estate, and keep his individuality; nor does it matter, in the aspect we are now considering, that he took the office at the request of the corporation, or that the latter advanced the expenses of the administration.     Among those who were entitled to administration under the law (section 52, Prob. Act; page 448, Laws 1851) in force at the time of the administration of the Gray estate were creditors; and, by the same law (section 66), administration could be granted to any competent person, although not entitled, at the request of a person entitled.     Such a request certainly did not confuse or confound the identity of the parties, and make him an administrator who was not so in fact, by irresistible inference of law.     Nor can I conceive of any good which would be served by it; while it is easy to conceive the embarrassment, and even detriment, of it.     If fraud, in fact, be committed, through means of the administration, as was done in .Herndon v. Kuykendall's Heirs, 58 Tex. 341 (cited by plaintiffs' counsel), the remedy is obvious and ample.

As to fraud in fact in the administration of Gray's estate, or in the sale of the property, I can find no evidence.     As we have already seen, there are circumstances in this case, as there were in Clark v. Trust Co., supra, which challenge inquiry; but inquiry shows only, in addition, the letters of Butterworth.     These, however, are explicable on other grounds than fraud.     They, undoubtedly, display interest and zeal, but these cannot be assumed to be sinister without the support of other circumstances, however easy and plausible it may be to so represent them.     Indeed, there is nothing which appears so, except the references to Glassell, who had been the attorney of Gray.     A careful search through the testimony has convinced me that such references were but the expression of a superserviceable zeal, eager to exaggerate itself. There is not a particle of testimony which reflects on the fidelity of Glassell to Gray, or on the bona fides of the note and mortgage which he held against him.     For the payment of the latter, he had a right to resort to the estate; and his action, instead of being an evidence of fraud, is an evidence of good faith.     If Gray's interest was as valuable as it is claimed to have been, it must have been apparent to Glassell, and it is not conceivable in such case that he would have sold either his claim or his honor for $1,000. His claim alone amounted to $7,416, secured by a mortgage.     Not cupidity, but a natural and proper prudence, would have demanded more than $1,000, even if he had rated his integrity at nothing.

There is no proof of dishonesty in the claims presented by the defendant, or in the administration proceedings.     Aside from the connection of Hawley with the defendants, there is nothing to impugn his personal or official integrity or care, and it is conceded that the counsel who were employed could not have been used to

effect a fraudulent end. Nor could they have been deceived. Besides, Judge Rhodes, who commenced the proceedings, was early informed by Mr. Butterworth of the interest of the defendant in the administration proceedings, and, in consequence, explained to him what he (the judge) had done, and what he proposed to do. Judge Rhodes' memory is very imperfect as to who employed him originally, as I have already remarked, but he thought it was Sidney L. Johnson, and he remembered the name Janin. The latter, as appears from the record, claimed to be a creditor. Mr. Johnson, it will be remembered, was Mr. Walker's representative in California, and presented a claim against the Gray estate, and afterwards filed a voucher acknowledging the payment of the claim. It is not intimated that Johnson was dishonest in what he did; and, besides, he was one of plaintiffs' witnesses, and if the minerals in the mine were of very great value, as it is asserted, and as they undoubtedly were, it does not follow that Gray's claim to them was of great value.

It was appraised at $11,100, and was sold for $27,755. The sale was affirmed by the probate judge, presumably after a proper hearing. There is nothing to justify a doubt of the honesty of this action. But, besides, the title of Gray was disputed, and disputable not only by persons who claimed under the same title as he, but by the defendant, who claimed under an adverse title. The defendant was in possession, and had been for some years, holding against everybody, and is represented as a wealthy and powerful corporation. A claim so embarrassed and opposed may well have been considered worth not more than $11,100 in the judgment of the appraisers, or $27,755 in the judgment of the court. If confirmation be needed of the doubts which beset Gray's claim, it may be had in his own actions, and the actions of his heirs after his death, and in the correspondence with their lawyers. I think, therefore, that there was no fraud in the administration proceedings or in the sale of the property.

There were other questions discussed by counsel, but those I have passed on necessarily preceded them in consideration, except, perhaps, the charge of laches made by the defendant's counsel, and the statute of limitations. Without reciting the evidence or stopping to consider the authorities, it is enough to say that I have carefully considered both, and have concluded that the claim of laches is good against all the plaintiffs except Margaret Gray Dickinson; and this was the view my learned predecessor, Judge Sawyer, took, and expressed in passing on the demurrer to her bill, and this is a proper case for its application. All the chief actors are dead, and those who were connected with them in various relations who yet live have memories so defective and dim as to make dangerous any judgment from their testimony.

It is further urged by defendant that Margaret Gray Dickinson is barred by the limitation of time expressed in the California laws, as follows:

"No action for the recovery of any real estate sold by an executor or administrator under the provisions of this chapter shall be maintained by any heir or other person claiming under the deceased testator or intestate, unless it be commenced within three years next after the sale." Section 190.

This has been held by the supreme court of the state to apply to all sales, whether valid, voidable, or void. But, to start a statute of limitations, there must be some one against whom time can run. This is not denied by defendant's counsel, but they urge the administrator was such person, and that it made no difference that in the particular instance he was the person to sue and to be sued. I am not inclined to adopt quite so refined and abstract a view. It would virtually deny relief, and it is easily conceived that the bond of the administrator would be no adequate substitute. Time had not, therefore, run against Margaret Gray Dickinson; and, because it had not, it was necessary to pass on the validity of the probate proceedings and sale. These being valid, it follows that the bill of complainants must be dismissed.